## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| IN RE:<br><br>NICOLETTE BASEL-JOHNSON<br><br>Debtor. | Case No. 05 B 36481<br>Chapter 7<br>Judge John H. Squires |
| PETER and JANET VOZELLA,<br>individually and on behalf of GO WILD<br>FUN SAFARIS, INC., ROBERT<br>PACENTI and GLENBARD TRAVEL,<br>INC.<br><br>         Plaintiffs<br><br>v.<br><br>NICOLETTE BASEL-JOHNSON<br><br>         Defendant | Adversary Proceeding No.<br><br>**05A02735**<br><br>JURY TRIAL DEMANDED |

## COMPLAINT FOR DETERMINATION OF DISCHARGABILITY

Plaintiffs Peter Vozella, Janet Vozella individually and on behalf of Go Wild Fun Safaris, Inc., an Illinois corporation, and Glenbard Travel, Inc., an Illinois corporation and Robert Pacenti (collectively "Plaintiffs"), by and through their attorneys, Shelly B. Kulwin and Jeffrey R. Kulwin, KULWIN & ASSOCIATES, L.L.C., for their complaint against defendant Nicolette Basel-Johnson ("Basel-Johnson" or "Defendant") for determination of dischargability allege as follows:

FILED
RECEIVED
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS

DEC 1 2 2005

KENNETH S. GARDNER, CLERK
PS REP. - TCR

1

## I. JURISDICTION

1.      This is a core proceeding over which this Court has jurisdiction under 28 U.S.C. § 157(b).

2.      Defendant is the debtor in this Chapter 7 case. Plaintiffs are creditors of Defendant.

3.      This is an adversary proceeding to determine the dischargability of debts.

4.      Specifically, Defendant is indebted to Plaintiffs in a sum in excess of 2.5 million dollars ($2,500,000) plus interest on debts incurred by Defendant for obtaining property through theft, false pretenses, fraud, breaches of her fiduciary duties and false representations.

## II. THE PARTIES

5.      Plaintiff Peter Vozella (Mr. Vozella) resides in Cook County, Illinois, is, and was at all relevant times, a shareholder, director and Chief Financial Officer of Go Wild Safaris, Inc. (GWFS), an Illinois corporation. Peter Vozella brings these claims individually and on behalf of GWFS.

6.      Plaintiff Janet Vozella (Ms. Vozella) resides in Cook County, Illinois. At all relevant times, Janet Vozella is, and was at all relevant times, an officer, director, shareholder, and Chief Executive Officer of GWFS. Janet Vozella brings these claims individually and on behalf of GWFS.

7.      The Vozellas – which, for the purposes of this litigation, include Peter Vozella, Janet Vozella, and Janet Vozella's brother, plaintiff Robert Pacenti (Pacenti) – are the majority shareholders of GWFS.

8.     Plaintiff Glenbard Travel, Inc. (Glenbard Travel) is an Illinois corporation and is in the travel agency business.   Ms. Vozella is the principal officer and shareholder of Glenbard Travel.

9.     Defendant Nicolette Basel-Johnson ("Basel-Johnson" or "Defendant") resides in DuPage County, Illinois and at all relevant times was a GWFS shareholder, director and key employee.

### III.  THE FORMATION OF FUNS SAFARIS, INC.

10.     In the early 1970's, Defendants' parents, Michael and Joyce Basel (the Basels), founded Fun Safaris, Inc. (FSI), an Illinois corporation.   FSI – the Basels' family business – planned, marketed and sold travel packages for safaris in Africa and other parts of the world.

11.     During the course of FSI's business activities, the Basels developed extensive customer lists and long-standing relationships with zoos, travel groups and other travel vendors which allowed FSI to book and market travel packages competitively within the marketplace.   FSI was also uniquely able to plan, promote and sell travel packages given that Michael Basel operated previously an African safari travel planning company and Joyce Basel was born in South Africa.   As a result, the Basels have many contacts within South Africa to assist them in planning African safari trips.

3

12.    FSI relied heavily on these long-standing customer and business relationships and their unique African contacts to, among other things, market desirable and profitable travel packages, conveniently modify travel plans to accommodate its customers' needs, and obtain unique access to African travel destinations.

13.    In the late 1990's, the Basels, for all intents and purposes, turned over FSI's day-to-day business operations to their daughters Basel-Johnson and Kimberly Basel-Van Aswegen (Van-Aswegen).

14.    In or around 1998, FSI began to suffer from cash flow problems and other financial troubles. In addition, and upon information and belief, after gaining control of FSI, Basel-Johnson and Van Aswegen began to utilize and misappropriate FSI's business assets to support their lavish lifestyle and for their own self-aggrandizement.

15.    In or around 2001, as a result of its deteriorating financial condition, Basel-Johnson, the Basels and Van Aswegen began searching for FSI capital investors to assist it with its financial difficulties.

## IV.  THE VOZELLAS PURCHASE FSI'S ASSETS

16.    During June, July and August of 2001, Basel-Johnson, the Basels, and jointly and independently, approached Mr. Vozella and Ms. Vozella about whether they were interested in making a capital investment in FSI. Mr. Vozella advised Basel-Johnson, Van Aswegen and the Basels that he had no interest in becoming a FSI capital investor. Nevertheless, Basel-Johnson repeatedly and, at times desperately, approached Vozella about investing in the Basels' family business.

17.  Basel-Johnson, the Basels, and Van Aswegen falsely represented to Vozella on multiple occasions that FSI's financial troubles were due to a series of unfortunate world events but that the travel industry was due to pick up and return to profitability within the next year.  In reality, FSI had financial problems because Basel-Johnson, Van Aswegen and the Basels were looting the company to support their own lavish lifestyle.

18.  Vozella advised the Basels, Van Aswegen and Basel-Johnson that, although he was not interested in investing in FSI or assuming any of its liabilities, the Vozellas may be interested in purchasing FSI's assets and taking control of the travel planning company.

19.  In that regard, during July and August of 2001, the Vozellas, Basel-Johnson, the Basels and Van Aswegen met on numerous occasions to discuss FSI and its business opportunities.  The Basels ultimately agreed to sell to the Vozella family all of FSI's assets.  In order to effectuate the asset purchase, Vozella formed a new Illinois corporation called Go Wild Fun Safaris, Inc. (GWFS).

20.  On November 6, 2001, the parties executed an asset purchase agreement (Agreement).  A copy of the Agreement is attached hereto and incorporated herein as Exhibit "A".

21.     Pursuant to the terms of the Agreement, GWFS purchased all of FSI's assets including, but not limited, its good will, accounts receivable, office equipment, business telephone number and customer lists from 1998 to the present.   Given FSI's poor financial condition, the Agreement specifically provided that GWFS assumed none of FSI's liabilities.

22.     Pursuant to the terms of the Agreement, the Basels received nothing in return for selling FSI's assets.   However, the Agreement specifically provided that the Basels' daughters, Van Aswegen and Basel-Johnson, would each become 12.5% shareholders of GWFS.   The Vozellas owned the remaining GWFS shares.

23.     After the execution of the Agreement, Basel-Johnson was elected to serve as a GWFS director.   At all times relevant hereto, Van Aswegen and Basel-Johnson were key GWFS employees and, in light of their extensive family history, contacts and experience in the travel industry, ran GWFS' day-to-day business affairs.   Basel-Johnson and Van Aswegen had check-writing authority and access to all GWFS' bank accounts and business records.   Unbeknownst to the Vozellas, Basel-Johnson and Van Aswegen surreptitiously allowed the Basels to retain full check-writing authority on GWFS' bank accounts.

## V. BASEL-JOHNSON UNLAWFULLY MISAPPROPRIATES THE VOZELLAS' AND GWFS' ASSETS

24.    Although GWFS did not assume any of FSI's liabilities, Basel-Johnson represented to the Vozellas that it was critical to GWFS' success to maintain FSI's business relationships with its customers and vendors given, among other things, that: (1) FSI had booked travel arrangements for trips that were imminent and/or occurring during the FSI/GWFS transfer; and (2) GWFS needed relationships with these vendors to book future travel packages. As a result, GWFS' business opportunities were almost exclusively dependant upon FSI's pre-existing customers, business relationships, and good will.

25.    At or near the time of the execution of the Agreement, Vozella, Van Aswegen and Basel-Johnson met frequently to discuss FSI's liabilities and the amount of cash GWFS needed to operate and to repay FSI's most critical debts to ensure both a smooth transition in ownership and GWFS' future success in the travel industry.

26.    Basel-Johnson represented to Vozella that GWFS did not have the funds to pay certain key vendors but that the vendors must be paid if it intended to maintain relationships with both the customers booked for trips and the vendors who arranged the itineraries for the trips.

27.   In that regard, the parties agreed to obtain jointly a one hundred fifty thousand dollar ($150,000.00) business line of credit from Hinsbrook Bank.  The Hinsbrook Bank business line of credit was personally guaranteed by, among others, the Vozellas, Pacenti, Van Aswegen and Basel-Johnson.

28.   In addition, and in order to further assist GWFS in repaying certain key FSI debts and keep current on its operating expenses, the Vozella family provided and used their own personal funds to pay for GWFS' expenses and/or transferred their personal funds to GWFS.  Specifically, between late September 2001 and March 2002: (a) the Vozellas provided their own personal funds to pay GWFS' expenses and/or provided those funds directly to GWFS including, but not limited to, approximately fifty-eight thousand dollars ($58,000.00) in cash and forty-two thousand dollars ($42,000.00) which was charged on their personal and business American Express cards; and (b) Pacenti provided directly to GWFS approximately twenty-six thousand dollars ($26,000.00) which was charged on his personal credit card.

29.   Prior to utilizing and/or infusing their personal capital for GWFS' expenses, the Vozellas told Basel-Johnson and Van-Aswegen that they could not afford to be without their capital for long.  Van Aswegen and Basel-Johnson agreed that GWFS would repay the Vozellas for their personal cash advances as soon as possible when new travel packages were booked.

30.   Vozella later learned that FSI customers had already paid FSI for these trips but that FSI did not pay its vendors because Van Aswegen and Basel-Johnson utilized FSI's funds for their own personal expenditures and self-aggrandizement.

31.   Between September 2001 and August 2002, the Vozella family utilized approximately four hundred fifty thousand dollars ($450,000.00) of their personal funds for GWFS' expenses.  Pursuant to the parties' agreement, Van Aswegen and Basel-Johnson caused GWFS to repay to the Vozellas approximately two hundred seventy thousand dollars ($270,000.00) by either writing GWFS checks directly to the Vozellas or to other entities at Vozella's request.

32.   Between September 2001 and August 2002, while the Vozellas and Pacenti were repeatedly utilizing in excess of four hundred and fifty thousand dollars ($450,000.00) of their personal capital for GWFS' business expenses purportedly to keep it in business in reliance on Basel-Johnson's representations, Van Aswegen and Basel-Johnson surreptitiously caused numerous checks to be drawn on GWFS' corporate bank accounts to pay for their own and their families' personal expenses which were wholly unrelated to any GWFS business expenses including, but not limited to:

(a)   over two hundred thousand dollars ($200,000.00) in payments to Business First, Chase Credit Card, Citi Platinum Select Card, Bank One, First USA Bank, Quantum Visa, Capital One, CitiGold AA, MBNA American, United Mileage Visa Card and American Express for the Basels, Van Aswegen and Basel-Johnson's personal credit card expenses;

(b)     over twenty-two thousand dollars ($22,000.00) in payments to Homeside Lending, Country Wide Home Loans, Household Credit Services, Bank One Home Equity Line, and Homeside Lending representing payments toward the Basels' home mortgage and home equity loans;

(c)     over five thousand dollars ($5,000.00) in payments to the Westlake Townhome Association representing payments for the Basels' monthly home owners' assessments on their three (3) townhomes;

(d)     over ten thousand dollars ($10,000.00) in payments to Tutor Time and Ann Pearson representing payments for day care and babysitting services for Van Aswegen and Basel-Johnson's children;

(e)     over nine thousand dollars ($9,000.00) in payments to Home Depot, the DuPage County Collector, the Village of Bloomingdale and Commonwealth Edison representing various payments for personal expenses relating to the Basels' homes;

(f)     a five thousand seven hundred sixty-five dollar ($5,765.00) payment to OSI Collection Services to repay an outstanding debt incurred on Joyce Basel's credit card;

(g)     a four thousand dollar ($4,000.00) payment to the law firm of Kovitz, Shifrin & Nesbit on August 19, 2002 representing payment to Van Aswegen and Basel-Johnson's attorneys for their personal litigation expenses;

(h)     over ninety thousand dollars ($90,000.00) in cash withdrawals including a forty thousand dollar ($40,000.00) cash withdrawal on July 29, 2002 to repay personal debts to Dave Herbert;

(i)     over four thousand dollars ($4,000.00) in payments to Lauren Victory representing payments for the Basels' home cleaning services;

(j)     over six thousand dollars ($6,000.00) in payments to Mony Life Insurance and Prudential Insurance representing premium payments for the Basels' personal cash-value life insurance policies;

(k)     over forty-five thousand dollars ($45,000.00) in payments to Suntech Recruiting representing payments to Basel-Johnson's husband's company; and

(l)     over four thousand dollars ($4,000.00) in payments to Michael Basel's
Mobile Credit Card representing payments for the Basels, Van Aswegen
and Basel-Johnson's personal automobile gas purchases.

33.     Directly contrary to Van Aswegen and Basel-Johnson's representations
to Vozella, there was insufficient funds to repay the Vozella family and GWFS was
unable keep current on its financial obligations due to Van Aswegen and Basel-
Johnson's misappropriations of GWFS' funds.

34.     In addition, and as a direct result of Basel-Johnson's conduct in this
matter, Vozella has personally paid over forty-eight thousand dollars ($48,000.00) to
Hinsbrook Bank toward GWFS' business line of credit.   Hinsbrook Bank is owed
approximately one hundred two thousand dollars ($102,000.00) on the GWFS line of
credit.

35.     On August 19, 2002, Van Aswegen and Basel-Johnson retained counsel
and ultimately filed a complaint to dissolve GWFS in the Circuit Court of Cook County,
Chancery Division in a matter styled as *Michael Basel, et. al. v. Peter Vozella et. al,*
Case No. 02 CH 18031 before the Honorable Judge Julia Nowicki (hereafter referred
to as the "Cook County lawsuit").

## V.  BASEL-JOHNSON COMPETES WITH AND USURPS GWFS' CORPORATE OPPORTUNITIES

36.     In February, 2002, Basel-Johnson met with GWFS's accountant to discuss
opening another travel planning company which would compete directly with GWFS.

37.    In July 2002, Basel-Johnson and Van Aswegen began to utilize a pre-existing corporation, New Horizons Safari Specialists, Inc. (New Horizons), to arrange travel packages for GWFS customers.  Basel-Johnson and Van Aswegen began to divert GWFS' business opportunities to New Horizons.

38.    New Horizons is in the exact same business as GWFS and utilized GWFS' customer lists and vendor relationships for its business.  New Horizons booked travel for individuals who were previously booked through GWFS.

39.    On or about August 23, 2002, Van Aswegen and Basel-Johnson coerced a Glenbard Travel employee to give them airline tickets valued at one hundred eight thousand dollars ($108,000.00) which were kept in a safe without paying for those tickets.  Vozella later learned that GWFS was paid by its customers for those tickets but GWFS never paid for the tickets because, as was their pattern and practice, Van Aswegen and Basel-Johnson used those funds for their own personal expenses. As a result, the Vozellas were ultimately required to pay Airline Reporting Corporation from their personal funds for those tickets.

40.    On February 6, 2003, Joyce Basel incorporated Unlimited Fun Safaris, Inc. (UFS). Basel-Johnson conspired with Joyce Basel to misappropriate GWFS' assets and usurp GWFS' corporate opportunities.  UFS is in the exact same business as GWFS and also utilizes GWFS' customer lists and vendor relationships for its business.

12

41.     After the Cook County matter was initiated, UFS and New Horizons began to utilize GWFS' office space, its business telephone number, customer lists and its vendor relationships.   The New Horizons and UFS' business and business opportunities are, in fact, GWFS' business and business opportunities.

42.     Based upon Plaintiffs' personal knowledge and experience in the travel industry, since July 2002, Basel-Johnson, UFS and New Horizons have earned in excess of 2.5 million dollars ($2,500,000.00) in gross revenues from both New Horizons and UFS.

43.     Basel-Johnson filed for bankruptcy protection a month before the Cook County lawsuit trial.   The Basels also caused New Horizons and UFS to file for bankruptcy protection.

44.     The debts owed to Plaintiffs by Defendant are non-dischargeable pursuant to section 523(a) of the United States Bankruptcy Code.

45.     Upon filing Defendant's petition in this court, Judge Nowicki stayed all proceedings pending the resolution of the bankruptcy proceedings.

46.     Upon information and belief, and based on their past pattern and practice, Basel-Johnson is utilizing, or will continue to utilize, GWFS' assets and good will to operate another African safari travel company in the future.

47.     GWFS has been damaged in an amount which cannot be calculated with certainty at this time but, in any event, is in excess of 2.5 million dollars ($2,500,000.00).

## COUNT I
## CONVERSION AND THEFT

48.   Plaintiffs re-allege paragraphs 1 through 47 as if fully stated herein.

49.   Basel-Johnson misappropriated, stole and converted in excess of 2.5 million dollars ($2,500,000.00) in funds for their own personal use.

50.   Basel-Johnson wrongfully and without authorization converted these funds for her own personal use.

51.   Basel-Johnson's conduct in stealing and converting these corporate funds was willful, malicious wanton and warrant the imposition of punitive damages.

## COUNT II
## BREACH OF FIDUCIARY DUTY

52.   Plaintiffs re-allege paragraphs 1 through 52 as if fully stated herein.

53.   As a GWFS, director, shareholder and key-employee, Basel-Johnson owed GWFS and the Vozellas a fiduciary duty of undivided loyalty, honesty and a duty not to usurp corporate assets and commit corporate waste.

54.   Basel-Johnson intentionally breached her fiduciary duty by, among other things, surreptitiously causing unauthorized payments for her personal expenses and absconding with GWFS' business opportunities.

55.   Basel-Johnson's conduct in breaching her fiduciary duties was willful, malicious wanton and warrant the imposition of punitive damages.

14

## COUNT III
## FRAUD/MISREPRESENTATION

56.    Plaintiffs re-allege paragraphs 1 through 55 as if fully stated herein.

57.    Basel-Johnson made multiple false statements of material fact including, but not limited to, that she would transfer FSI's goodwill and assets to GWFS in order to grow GWFS' business and that GWFS had insufficient funds to pay its vendors and business expenses.

58.    Basel-Johnson's statements and representations were material.

59.    Basel-Johnson knew her statements were false at the time she made them and did so in order to induce Plaintiffs to contribute funds to pay GWFS' expenses, execute the Agreement and obligate themselves personally on corporate loans.

60.    Plaintiffs did in fact rely on the representations set forth above.

61.    Plaintiffs' reliance on these statements and misrepresentations was reasonable.

62.    As a result of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial.

63.    Basel-Johnson's conduct was willful, malicious wanton and thus entitles Plaintiffs to punitive damages.

## COUNT IV
## TORTIOUS INTERFERENCE WITH CONTRACT

64.    Plaintiffs re-allege paragraphs 1-63 as if fully stated herein.

65.    The Agreement between GWFS and FSI is a valid and enforceable contract.

66.   Basel-Johnson was aware of the GWFS/FSI Agreement.

67.   Basel-Johnson intentionally and maliciously breached, or caused FSI to breach, the Agreement by, among other things, absconding with FSI's assets and business opportunities including, but not limited to, its good will, business telephone number and customer lists and depriving GWFS of the benefits of those assets. Basel-Johnson's conduct was willful, wanton and thus entitles Plaintiffs to punitive damages.

## COUNT V
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE AND BUSINESS E4XPECTANCY

68.   Plaintiffs re-allege paragraphs 1-67 as if fully stated herein.

69.   GWFS had a reasonable expectation of entering into business relationships with FSI's customers.

70.   Basel-Johnson was aware of GWFS' business expectancy.

71.   Basel-Johnson intentionally and maliciously interfered with GWFS' reasonable business expectancy by diverting GWFS' business to New Horizons and UFS. Basel-Johnson's conduct was willful, wanton and thus entitles Plaintiffs to punitive damages.

## PRAYER FOR RELIEF COMMON TO ALL COUNTS

WHEREFORE, plaintiffs Peter Vozella, Janet Vozella individually and on behalf of Go Wild Fun Safaris, Inc., an Illinois corporation, and Glenbard Travel, Inc., an Illinois corporation and Robert Pacenti respectfully request that this Court:

(a)    determine that the debts owed to Plaintiffs by defendant Nicolette Basel-Johnson are non-dischargeable;

(b)    award Plaintiffs a judgment against defendant in the amount to be proven at trial or, in the alternative, lift the automatic bankruptcy stay with respect to these debts and allow the proceedings in this matter before the Circuit Court of Cook County to go forward; and

(c)    award Plaintiffs any other relief this Court deems fair and just including reasonable attorneys' fees and costs.

### PLAINTIFFS DEMAND A JURY TRIAL ON ALL CLAIMS FOR WHICH A JURY TRIAL IS ALLOWED

Respectfully submitted,

Shelly B. Kulwin
Jeffrey R. Kulwin
KULWIN & ASSOCIATES
161 N. Clark, Suite 2500
Chicago, IL 60601
312/641-0300

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT ("Agreement") is entered into as of November 6, 2001, between, FUN SAFARIS, INC., an Illinois corporation," of 231 Lake Shore Lane, Bloomingdale, Il. 60108("Seller"), and GO WILD FUN SAFARIS, INC., an Illinois Corporation, of 2045 Bloomingdale Road, Glendale Heights, IL. 60139
in Formation ("Buyer").

## WITNESSETH:

WHEREAS, Buyer desires to purchase certain of Seller's assets from Seller, and Seller desires to sell and assign the same to Buyer as set forth herein; and

WHEREAS, Michael P. Basel and Joyce A. Basel (Owners) of 229 Lake Shore Lane, Bloomingdale, Il. are the sole shareholders of Seller;

NOW, THEREFORE, in consideration of the foregoing recitals and of the covenants, conditions, representations, warranties and promises herein contained, the parties agree as follows:

## SECTION 1

### Purchase of Assets
### and Purchase Price

1.1    PURCHASE AND SALE OF ASSETS.  At the Closing (as defined in Section 5.1 below), Seller shall sell to Buyer, and Buyer shall purchase from Seller, upon the terms and subject to the conditions set forth in this Agreement, all of Seller's right, title and interest in and to those certain assets, personal property and rights (including goodwill), owned by Seller and used in the business as more specifically identified on Schedule 1.1 (the "Transferred Assets").

1.2    NO LIABILITIES ASSUMED.  Buyer is not assuming any liabilities of Seller, and all such liabilities shall be and remain the responsibility of Seller.

1.3    PURCHASE PRICE.  Subject to the terms of Section 1.4 below, Buyer shall pay to Seller, as the purchase price for the Transferred Assets (the "Purchase Price"), the sum of TEN DOLLARS ($10.00), Plus 250 shares of the common Stock of Buyer divided equally between Nicolette Base-Johnson and Kimberly Basel-Van Aswegen which shares represent twenty-five percent (25%) of the issued and outstanding shares of Stock of Buyer, payable as provided in Section 1.4 below.

1.4    PAYMENT OF THE PURCHASE PRICE.  Buyer shall make payment of the Purchase Price to Seller as follows:

(a)    upon execution of this Agreement, Buyer shall deliver to Seller by check the sum of TEN



EXHIBIT

_A_

Exhibit C

DOLLARS ($10.00) as earnest money (the "Earnest Money") to be held by Seller. and

(b)    at the Closing (as defined in Section 5.1 herein), Buyer shall deliver to Seller the balance, consisting of two Stock Certificates in the amount of 125 shares each in the names of Nicolette Base-Johnson and Kimberly Basel-Van Aswagen

1.5    <u>EXCLUDED ASSETS.</u> The "Excluded Assets" shall mean any and all assets of Seller other than those described in Schedule 1.1 attached hereto, including, without limitation, the following assets of Seller, as described below. The Excluded Assets are expressly excluded from the purchase and sale contemplated hereby and, as such, are not included in the Transferred Assets:

(a)    All investments in common or other shares of stock of any corporation, it being specifically acknowledged by Buyer that the stock of the Seller shall not be transferred to Buyer hereunder;

(b)    (i) general books of account and books of original entry that comprise Seller's tax records and all other books and records of Seller, (ii) books and records which relate exclusively to the Excluded Assets, and (iii) personnel and employee related records, provided, however, that, to the extent not prohibited by any Employee or applicable law, Seller will allow Buyer access to such records;

(c)    All policies of insurance and the premiums, reserves and deposits attributable thereto, including the cash surrender value of any life insurance policies on the life of the Owner's ;

(d)    Any federal, state or local income or other tax credits and refunds due Seller;

(e)    Any works of art and any personal belongings of the Owner located in the Premises;

SECTION 2

Representations and Warranties of Sellers

To induce Buyer to enter into this Agreement and to consummate the transactions contemplated hereunder, Seller represents and warrants to Buyer as follows:

2.1   ORGANIZATION, CORPORATE POWER AND QUALIFICATION.   Seller is a corporation duly organized, validly existing and in good standing under the laws of Illinois. Seller has full corporate power and authority to own or lease and operate its properties and to carry on its business as it is now being conducted.

2.2   AUTHORITY AND NO CONFLICT.   The execution, delivery and performance of this Agreement by Seller has been duly authorized by its shareholders and directors in accordance with Illinois law. This Agreement constitutes a valid and binding obligation of Seller enforceable against Seller in accordance with its terms. No other corporate action is necessary on behalf of Seller to authorize the transactions contemplated in this Agreement. The consummation of the transactions contemplated in this Agreement by Seller will not conflict with, or result in a breach of, Seller's Articles of Incorporation or By-Laws.

2.3   MARKETABLE TITLE. At Closing, Buyer will receive good and marketable title to all the Transferred Assets, free and clear of all liens or any nature whatsoever, including without limitation, Federal, State or Local tax liens.

2.4   CONDITION OF TRANSFERRED ASSETS.   Seller represents that all of the assets and personal property listed on Schedule 1.1 (the "transferred assets:) are in working order and will be in the substantially the same physical condition and state of repair on the Closing date as of the date hereof, normal wear and tear excepted.

2.5.   UCC SEARCHES.   Buyer agrees at its cost to obtain current UCC reports from the Secretary of the State of Illinois and from the County of DuPage for UCC-1 filings, Federal and State tax lien searches and judgment and lien searches against the business and corporation. Buyers obligation to close is contingent upon its approval of the results of said reports and searches

2.6   LITIGATION. Seller represents that there is no pending or, to the knowledge of the Seller, any threatened action, suit, claim, demand proceeding or investigation at law or in equity before any Court, Arbitrator, Public Board or Body, and further Seller represents that there have been no claims asserted or investigation initiated by any federal, state or local government authority for taxes or any other allegedly improper action.

2.7   OPERATION OF BUSINESS.   Seller warrants it shall operate the business until the Closing Date and transfer all customer lists to the Buyer. From and after the Closing Date, Seller agrees that the customer lists shall be the exclusive property of Buyer. Seller

-3-

further agrees that Seller shall devote its best efforts to the preservation of good will and customers of the business prior to the Closing Date.

2.8    GOVERNMENTAL NOTICES. Seller represents that it has not received any notices of any violation of any federal, state or local laws, codes, ordinances or regulations concerning the business located at 231 Lake Shore Lane, Bloomingdale, Illinois.

2.9    INDEMNIFICATION. Seller represents that it shall indemnify and hold harmless Buyer at all times from and after the date of closing from and against any and all claims, actions, causes of actions, lawsuits, damages, costs and expenses, including reasonable attorneys' fees arising out of or incident to or in connection with any of the following:

    (a)    Title to the Transferred Assets.

    (b)    Any and all claims existing prior to the Closing Date by a present or former employee, whether or not the employee becomes an employee of Buyer, of any nature whatsoever arising out of their employment or business relationship with Seller.

    (c)    Any and all claims existing prior to the Closing by a present or former customer of Seller.

## SECTION 3

### Representations and Warranties of Buyer

To induce Seller to enter into this Agreement and to consummate the transactions contemplated hereunder, Buyer represents and warrants to Seller as follows:

3.1    AUTHORITY AND NO CONFLICT. The execution, delivery and performance of this Agreement by Buyer, and the transactions contemplated hereby, have been duly authorized by all necessary actions on the part of Buyer, and this Agreement constitutes the legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with its terms. The consummation of the transactions contemplated in this Agreement by Buyer will not conflict with or result in a breach of any obligations of Buyer or the material terms, conditions or provisions thereof, or constitute a default under, or result in an acceleration of any obligation under, any material agreement, indenture, loan agreement, lease, other instrument, judgment, decree, rule or order with Buyer as a party to or by which it is bound, and will not result in any violation by Buyer of any statute or regulation of any governmental authority. No consents or approvals of any governmental authority are required in connection with Buyer's execution or delivery of this Agreement and its consummation of the transactions contemplated hereby.

-4-

3.2     BROKERS. There are no brokers or finders involved, directly or indirectly, for the Seller or Buyer, or entitled to any fee or commission with respect to this Agreement or the transaction contemplated herein. Each party shall save, protect, indemnify and hold harmless the other from the claims of any broker or finder claiming any commission or finder's fee by or through Seller or Buyer, and all costs and attorneys' fees incurred by either as a result thereof.

3.3     NO VIOLATION. Buyer is not subject to or obligated under any Articles of Incorporation, Operating Agreement, any applicable law, rule or regulation of any governmental authority, or any agreement or instrument, or any license, franchise or permit, or subject to any order, writ, injunction or decree which would be breached or violated by its execution, delivery or performance of this Agreement. Buyer shall comply with all applicable laws, and with all applicable rules and regulations of all governmental authorities in connection with its execution, delivery and performance of this Agreement.

## SECTION 4

### Mutual Covenants of Buyer and Seller

4.1     CONFIDENTIALITY. Through and including the Closing, each party to this Agreement shall, and shall cause its officers, accountants, counsel, and other authorized representatives and affiliated parties, to hold in strict confidence and not use or disclose to any other party without the prior written consent of the other party, all information obtained from the other party in connection with the transactions contemplated hereby, except such information may be used or disclosed (i) when required by any regulatory authorities or governmental agencies, (ii) if required by court order or decree or applicable law, (iii) if it is publicly available other than as a result of a breach of this Agreement, or (iv) if it is otherwise contemplated herein.

## SECTION 5

### Closing

5.1     CLOSING. The consummation of the transaction contemplated hereby (the "Closing") shall occur on or before November 9, 2001 (the "Closing Date") or at such other time and date mutually agreed upon by the parties at the offices of Glenbard Travel Agency, 2045 Bloomingdale Road, Glendale Heights, IL 60139, provided all conditions precedent have been fully satisfied.

5.2     SELLER'S DELIVERIES. On the Closing Date, or as soon thereafter as possible Seller shall execute and deliver in exchange for Buyer's deliveries, the following closing documents:

        (a)     Bill of Sale in a form substantially similar to
                Exhibit "A".

(b)    Secretary's Certificate authenticating the
Resolutions of Seller's Board of Directors and
Shareholders.

(c)    A certificate issued from the Illinois Department
of Revenue showing that no tax, penalty or
interest is due from Seller under the Retailers
Occupation Tax Act, pursuant to Illinois Compiled
Statutes Chapter 7-120, Paragraph 444(j), or a
statement indicating the amount due.

(d)    A letter from the Illinois Department of Labor showing all unemployment
tax's are current.

(e)    A Bulk Sales Affidavit listing all creditors.

5.3    BUYER'S DELIVERIES.  On the Closing Date, Buyer shall deliver in exchange
for Sellers' deliveries as aforesaid, the following closing documents

(a)    The Stock Certificates described in Section
1.4(b) above, which shall be held in Escrow, by
Peter Vozella, as Escrowee, pending receipt of
items listed in Par. 5.2 (c) and (d) above.

(b)    Such other documents, instruments and confirmations
as may be reasonably required and designated by Seller
to fully effect and consummate the transactions
00000 contemplated hereby.

5.4    APPROVAL OF CLOSING DOCUMENTS.  All closing documents to be
furnished by Seller or Buyer pursuant hereto shall be in form, execution and substance
reasonably satisfactory to the parties hereto.

5.5    CONDITIONS PRECEDENT TO CLOSING.  Buyer's obligation to close
hereunder is expressly contingent upon Buyers obtaining of a satisfactory reports from Lexis
Document Services relating to the UCC Tax and Lien searches.

## SECTION 6

### General Provisions

6.1    RISK OF LOSS.  Seller agrees to assume the risk of loss or damage resulting
from fire or other casualty prior to the Closing Date.  In the event of such loss, Seller agrees
that Buyer shall have the right to either terminate this Agreement by written notice to Seller, or

to take a credit because of such loss, damage or other casualty; however, said credit shall be expressly limited to the actual net insurance proceeds received by Seller.

6.2   SURVIVAL.  All covenants, agreements, representations and warranties made by the parties each to the other or in pursuant to this Agreement shall survive the Closing.

6.3   GOVERNING LAW.  This Agreement shall be construed and interpreted according to the laws of the State of Illinois.

6.4   FURTHER ASSURANCES.  After the Closing date, without further consideration, each of the parties hereto shall execute and deliver such further instruments and documents as any other such party shall reasonably request to consummate the transactions contemplated by this Agreement and to perfect Buyer's title to the Transferred Assets and to complete the transfer of the obligations with respect to the Assumed Liabilities.

6.5   NOTICES.  All notices required to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered by hand, the first business day following delivery by nationally recognized, reputable overnight courier, upon receipt of transmission by facsimile with proof of such transmission, or three (3) days after having been mailed by certified or registered mail, return receipt requested, postage prepaid, to the intended recipient at the address set forth below, or at such other address as such party may from time to time notify the other parties:

(a)   IF TO SELLER:

FUN SAFARIS, INC.
231 Lakeshore Lane
Bloomingdale, Il. 60108
Attention:     Michael P. Basel

(b)   IF TO BUYER:

GO WILD FUN SAFARIS, INC.
c/o Glenbard Travel Agency
2045 Bloomingdale Road
Glendale Heights, IL. 60139
Attention:     Janet Vozella

6.6   COUNTERPARTS.  This Agreement may be executed simultaneously in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

6.7    TELEFAX.    For purposes of executing this Agreement, any signed document transmitted by telefax machine shall be treated in all manner and respects as an original document, and the signature of any party on such telefax document shall be considered an original signature.

6.8    ENTIRE AGREEMENT.  This Agreement and the exhibits, documents and agreements executed by the parties simultaneously herewith or at the Closing constitute the entire understanding and agreement of the parties hereto and supersede all other prior agreements and understandings, written or oral, between the parties.

6.9    SEVERABILITY.  In case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision or provisions had never been contained herein.

6.10    ASSIGNMENT.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

6.11   HEADINGS.  The headings contained in this Agreement are inserted for convenience only and shall not constitute a part hereof.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SELLER: FUN SAFARIS, INC.
an Illinois Corporation
By: _____
Michael B. Basel, individually

By: _____
Joyce A. Basel, individually

BUYER:
GO WILD FUN SAFARIS, INC.
An Illinois Corporation, in Formation

By: _____
Janet Vozella

-8-

<u>SCHEDULE 1.1</u>

<u>TRANSFERRED ASSETS</u>

1.    Assignment of Business Telephone Number 630-893-2545

2.    Office equipment, including computers, phones and desks.

3.    Promotional items, including Bags, T-shirts, Tags, etc.

4.    Accounts Receivable in the amount of $353,833.00.

5.    Gorilla Permits valued at $11,770.00

6.    Customer Lists for years 1998 to present.

SCHEDULE 1.2

ASSUMED LIABILITIES

None

EXHIBIT "A"

TO THAT CERTAIN
ASSET PURCHASE AGREEMENT
BETWEEN
FUN SAFARIS, INC., an
Illinois Corporation
AND
GO WILD FUN SAFARI'S, INC. An
Illinois Corporation

BILL OF SALE

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, FUN SAFARIS, INC., an Illinois Corporation ("Seller") hereby sells, assigns, transfers and conveys to GO WILD FUN SAFARIS, INC, an Illinois Corporation ("Buyer") all of the Transferred Assets ( as such term is defined in the certain Asset Purchase Agreement dated November 8, 2001 by and between Seller and Buyer).

Seller hereby represents and warrants to Buyer that Seller has and hereby conveys good and marketable title to all of the Assets, free and clear of all liens, security interests and encumbrances. ALL WARRANTIES, INCLUDING, WITHOUT LIMITATION, OF QUALITY, FITNESS FOR A PARTICULAR PURPOSE AND MERCHANTABILITY ARE HEREBY EXPRESSLY EXCLUDED.

IN WITNESS WHEREOF, Seller has executed and delivered this Bill of Sale as of this ___7___ day of November, 2001

FUN SAFARIS, INC.,
an Illinois corporation

BY: _____
Title: _____PRESIDENT_____

ACCEPTANCE

GO WILD FUN SAFARIS , INC., Buyer, hereby accepts and acknowledges receipt of the transferred assets pursuant to the above Bill of Sale.

BY: _____

Certificate Number ___111080___



# STATE OF ILLINOIS
## OFFICE OF
### THE SECRETARY OF STATE

# To all to whom these Presents Shall Come, Greeting:

**Whereas,** *Articles of Incorporation duly signed and verified of*

FUN SAFARIS, INC.

*have been filed in the Office of the Secretary of State, on the* ___20th___
*day of* ___FEBRUARY___ *A. D. 19 76, as provided by" THE BUSINESS
CORPORATION ACT" of Illinois, in force July 13, A. D. 1933.*

*Now Therefore, I* Michael J. Howlett *Secretary of State of the State of Illinois,
by virtue of the powers vested in me by law, do hereby issue this certificate of
incorporation and attach thereto a copy of the Articles of Incorporation
of the aforesaid corporation.*

# In Testimony Whereof, *I hereto set my hand and cause to
be affixed the Great Seal of the State of Illinois,
Done at the City of Springfield this* ___20th___
*day of* ___February___ *A.D.19 76 and
of the Independence of the United States
the one hundred and* ___00___

Michael J. Howlett          SECRETARY OF STATE.

BEFORE ATTEMPTING TO EXECUTE THESE BLANKS BE SURE TO READ CAREFULLY
THE INSTRUCTIONS ON THE BACK THEREOF.

### (THESE ARTICLES MUST BE FILED IN DUPLICATE)

| STATE OF ILLINOIS, | | (Do not write in this space) |
|---|---|---|
| | } ss. | Date Paid |
| DU PAGE _____ COUNTY | | Initial License Fee   $ |
| | | Franchise Tax     $ |
| To                    Secretary of State: | | Filing Fee      $ |
| | | Clerk |

The undersigned,

| Name | Number | Address<br>Street    City    State |
|---|---|---|
| Michael P. Basel | 229 Lakeshore Lane | Bloomingdale, Illinois |
| Joyce A. Basel | 229 Lakeshore Lane | Bloomingdale, Illinois |
| | | |
| | | |

being one or more natural persons of the age of twenty-one years or more or a corporation, and having subscribed to shares of the corporation to be organized pursuant hereto, for the purpose of forming a corporation under "The Business Corporation Act" of the State of Illinois, do hereby adopt the following Articles of Incorporation:

### ARTICLE ONE

The name of the corporation hereby incorporated is: _____ FUN SAFARIES, INC. _____

### ARTICLE TWO

The *address* of its initial registered office in the State of Illinois is: ___ 200 East Willow ___

Street, in the ___ City ___ of ___ Wheaton ___ ( 60187 ) County of ___ DuPage ___ and
{Zone}

the *name* of its initial Registered Agent at *said address* is: ___ Roger K. O'Reilly ___

### ARTICLE THREE

The duration of the corporation is: ___ Perpetual ___

## ARTICLE SIX

The class and number of shares which the corporation proposes to issue without further report to the Secretary of State, and the consideration (expressed in dollars) to be received by the corporation therefor, are:

| Class of shares | Number of shares | Total consideration to be received therefor: |
|---|---|---|
| Common | 1,000 | $  1,000.00 |

## ARTICLE SEVEN

The corporation will not commence business until at least one thousand dollars has been received as consideration for the issuance of shares.

## ARTICLE EIGHT

The number of directors to be elected at the first meeting of the shareholders is: ...........5...........

## ARTICLE NINE

PARAGRAPH 1: It is estimated that the value of all property to be owned by the corporation for the following year wherever located will be $............

PARAGRAPH 2: It is estimated that the value of the property to be located within the State of Illinois during the following year will be $............

PARAGRAPH 3: It is estimated that the gross amount of business which will be transacted by the corporation during the following year will be $............

PARAGRAPH 4: It is estimated that the gross amount of business which will be transacted at or from places of business in the State of Illinois during the following year will be $............

NOTE: If all the property of the corporation is to be located in this State and all of its business is to be transacted at or from places of business in this State, or if the incorporators elect to pay the initial franchise tax on the basis of its entire stated capital and paid-in surplus, then the information called for in Article Nine need not be stated.

## MEMORANDUM OF

## RECORDING

The original of the foregoing Certificate of
Incorporation, together with the duplicate original
of the Articles of Incorporation affixed thereto, was
filed for record in the Office of the Recorder of Deeds
of the County of DuPage    , in the State of Illinois,
on the 25th day of February , A. D. 1976, at the hour
of   2:00 o'clock;   .M. and was thereafter recorded, in
the said Office, as document numbered  R76-11335        .

Michael P. Basel
_____

Joyce A. Basel
_____    Incorporators

_____

_____

NOTE: There may be one or more incorporators. Each incorporator shall be either a corporation, domestic or foreign, or a natural person of the age of twenty-one years or more. If a corporation acts as incorporator, the name of the corporation and state of incorporation shall be shown and the execution must be by its President or Vice-President and verified by him, and the corporate seal shall be affixed and attested by its Secretary or an Assistant Secretary.

### OATH AND ACKNOWLEDGMENT

STATE OF ILLINOIS
_____County } ss.

I, _____, A Notary Public, do hereby certify that on the _____ day of _____ 196___,

_____
personally appeared before me and being first duly sworn by me acknowledged the signing of the foregoing document in the respective capacities therein set forth and declared that the statements therein contained are true.

IN WITNESS WHEREOF, I have hereunto set my hand and seal the day and year above written.

Place
(NOTARIAL SEAL)
Here                                    _____
                                              Notary Public

## ARTICLE FOUR

The purpose or purposes for which the corporation is organized are:

To develop, plan and arrange the wholesaling and retailing of safaris and tours to be conducted throughout the world; and to provide associated services:

To buy, sell, lease, own and deal in, and to transact business with respect to real and personal property and services in the fulfillment of the above activities.

## ARTICLE FIVE

PARAGRAPH 1: The aggregate number of shares which the corporation is authorized to issue is _____100,000_____ divided into _ONE (1)_ classes. The designation of each class, the number of shares of each class, and the par value, if any, of the shares of each class, or a statement that the shares of any class are without par value, are as follows:

| Class | Series (If any) | Number of Shares | Par value per share or statement that shares are without par value |
|-------|-----------------|------------------|--------------------------------------------------------------------|
| Common | N/A | 100,000 | $1.00 |

PARAGRAPH 2: The preferences, qualifications, limitations, restrictions and the special or relative rights in respect of the shares of each class are:

N/A